## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFF HOBBS; ALFRED DOUGLAS STONE; on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br> v.<br><br>META PLATFORMS, INC.; MARK ZUCKERBERG; GUILLAUME LAMPLE; JOELLE PINEAU; JOHN DOES 1-100,<br><br>     Defendants. | **CLASS ACTION**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jeff Hobbs and A. Douglas Stone (collectively "Plaintiffs"), bring this Class Action Complaint and Demand for Jury Trial on behalf of themselves and all others similarly situated (the "Class," as defined with specificity in Paragraph 122, *infra*.), against Meta Platforms, Inc. ("Meta") and Mark Zuckerberg, Guillaum Lample and Joelle Pineau (collectively, "Defendants") for copyright infringement based on (1) Defendants' pirating of Plaintiffs' and tens of millions of other authors' copyrighted books and the unauthorized reproduction and distribution of Plaintiffs' copyrighted works through torrenting on shadow websites on the internet rather than lawfully licensing them as others did; and, (2)  through Meta's sourcing of content for, and development and training of, Meta's generative artificial intelligence ("AI") platform called "Llama," using plaintiffs' copyrighted works and for removal of copyright management information ("CMI").  Plaintiffs allege as follows based on personal knowledge as to matters relating to themselves and on information and belief as to all other matters.

### INTRODUCTION

1. Meta was founded in 2021, as a rebranding of Facebook, after Mark Zuckerberg ("Zuckerberg") decided to enter the artificial intelligent ("AI") market and develop his own AI platform, riding the wave of strong industry and public interest in artificial intelligence, unprecedented investment in this sector and unparalleled potential for growth.

2. Meta's artificial intelligence platform was named, "Llama," a multi-billion dollar generative AI system.  To train Llama, Meta needed access to an unprecedented volume of subject matter material including, but not limited to, millions of copyrighted works of fiction, non-fiction and scientific content.

3.      To win the AI race, and Meta was prepared to do anything to access the vast quantities of the subject matter material it needed.

4.      In order to develop a robust artificial intelligence system, Meta required the use of large databases of information including, but not limited to, copyrighted works such as every conceivable form of fictional literature such as Plaintiff Hobbs' books (*e.g.*, poetry, prose, novels, plays, etc.), and non-fiction writing (*e.g.* books, essays, reports, etc.).  Meta also required scientific works including, but not limited to treatises, articles, research and reports in every scientific field and discipline such as Plaintiff Professor Stone's books and articles.  To create its own "library" of stolen books and materials to use as it saw fit, Meta illegally and undisputedly downloaded (otherwise known as "torrented") millions of copyrighted books and journal articles from notorious shadow libraries and pirate sites and downloaded unauthorized web scrapes of virtually the entire internet without regard to whether the works or information was copyrighted.  Meta then copied those stolen fruits many times over to train Meta's multi-billion-dollar generative AI system, Llama.  In doing so, Defendants engaged in one of the most massive and unprecedented infringements of copyrighted materials in history as well as simple theft and conversion.

5.      This case is fundamentally different from cases in which courts have considered whether the use of lawfully acquired copyrighted materials for technological purposes could qualify as fair use. Here, it is undisputed that Defendants did not lawfully acquire Plaintiffs' and the Class's copyrighted works.  Instead, Defendants intentionally downloaded millions of copyrighted books and articles from notorious pirate repositories including Library Genesis ("LibGen"), Anna's Archive, Z-Library, and related shadow libraries through BitTorrent and similar piracy mechanisms.  A defendant may not unlawfully pirate millions of copyrighted works and then retroactively immunize that piracy by claiming the stolen works were later used for AI training or some other allegedly transformative purpose just as you cannot steal an author's book from Barnes and Nobles and then copy it.  Defendants' unlawful acquisition, reproduction, retention, and redistribution of Plaintiffs' works constitute independent acts of infringement regardless of any later use Defendants claim to have made of the stolen materials.

6.      Because of the manner that Defendants downloaded this material, Defendants also reproduced and redistributed millions of copyrighted works without permission, without providing any compensation to authors or publishers, and with full knowledge that their conduct violated copyright law.  Meta's CEO Defendant Zuckerberg himself personally authorized and actively

2

encouraged the mass download and infringement. Meta also stripped copyright management information ("CMI") from the copyrighted works it stole — developing and deploying scripts specifically designed to delete copyright notices, author names, ISBN numbers, and publication information. It did this in part to conceal its training sources and to facilitate and conceal their unauthorized use.

7.      Meta could have licensed these works to use them for AI training purposes, but chose not to do so in order to avoid the high cost that licensing works on such a grand scale and volume would entail, and to offset the time that it would take to negotiate such licensing arrangements with so many different entities for such a vast range of copyrighted material. So it decided to take the easy way out, it stole them. The subsequent use of those unlawfully acquired works for AI training does not alter the fact that Defendants obtained, reproduced, retained, and redistributed Plaintiffs' copyrighted works through mass piracy, conduct long recognized as unlawful under copyright law.

8.      Meta made a conscious decision to violate copyright law by simply downloading and stealing these works from illegal sharing platforms, referred to as "torrent" sites. This was not a faceless corporate decision. Specific individuals at Meta conceived, directed, authorized, and executed this scheme of mass piracy. For example, Joelle Pineau ("Pineau"), Meta's Vice President of AI Research and head of FAIR (Fundamental AI Research), oversaw the development of Meta's Llama Models. Guillaume Lample ("Lample"), a Meta research scientist and now co-founder of AI competitor Mistral AI, likely torrented Meta's first copy of the shadow library LibGen — a copy that has since "vanished from Meta's possession." [1] Each of these individuals — along with Zuckerberg, Xiaolan Wang ("Wang"), Stephen Roller ("Roller") — bears direct responsibility for the devastation wrought upon the literary ecosystem.

9.      This Complaint alleges the reproduction of copyrighted works on a monumental and unprecedented scale. To conceal its theft and copyright infringement, Meta took action to cover up its steps in downloading the material, often writing special code to conceal its illicit activities. As a result of its actions, Meta downloaded and stole more than tens of millions of copyrighted works across thousands of genres and disciplines. Meta infringed the copyrights of

---

[1] Unless otherwise noted, all quotations in this Complaint are sourced from documents available in the public record.

millions of documents, books and other published material.  Meta's copyright infringement may constitute the largest infringement – literary piracy – in history.

10.    This Complaint also alleges that those works are now being used to by Meta's Llama AI to generate competing products that flood the market with substitute works: knockoff books, replacement chapters, summaries, derivative works, and imitations of specific authors' voices.  As set forth in detail below, Plaintiffs present substantial evidence of market dilution and indirect substitution — the precise market harm that copyright law exists to prevent and which precludes a defense of fair use.

11.    Plaintiffs and the putative Class are authors who own or control exclusive rights under the Copyright Act to millions of widely known and commercially valuable literary works, conceived of and created by real people.  These works span a vast breadth of human creativity and expression, including fiction and nonfiction, children's books, poetry, memoirs, travel writing, educational textbooks, and scholarly articles.  These works include copyright management information ("CMI") such as copyright notices, author names, copyright owners, and publication information.  Authors (with their editors and publishers) are the principal creators, disseminators, and protectors of their literary works.  Authors devote years to conceiving, writing, and refining their works.  Defendants' mass piracy treats human creative expression as mere raw material to be processed, consumed, and discarded as needed to serve Meta's technical and commercial objectives without any compensation to the authors.

12.    As a result of its theft, Meta deprived Plaintiff, and the putative Class of authors and creators of this vast amount of work, of compensation, of licensing opportunities, royalties and other forms of remuneration in the sale of their published work and vastly diluted the market for plaintiffs and the Class' works.

13.    Meta's actions also perpetuated the further infringement by third-parties, since Meta's particular method for downloading, on information and belief, enabled thousands of other users to do the same, thereby aiding and abetting innumerable infringements of the same works.  Meta could have prevented this distribution and copying from happening by simply changing a setting on BitTorrent but intentionally chose not to because allowing the pirated works to be copied and distributed to others was faster.

14.    Meta is now using such works to train its AI to replicate variations of these works for others and reaping huge rewards in subscription fees, investment and other forms of

compensation, while diluting the value of all the copyrighted works they unlawfully acquired. Defendants have profited — and continue to profit — massively from their infringement. Meta has predicted that by 2035, it will reap $460 billion to $1.4 trillion of revenue from its AI products, including Llama. That increased revenue will be earned off the backs of authors and creators whom Meta has refused to compensate.

15. For example, Meta's own employees recognized that the Llama models could produce outputs that directly compete with human-authored works. As Meta software engineer David Esiobu acknowledged internally, "Llama [wa]s annoyingly good at quoting books." Meta researcher Melanie Kambadur confirmed that downstream applications of Llama include use "as an aid for writing fiction or to output whole poems." The logical and inevitable consequence of training a text-generation machine on millions of stolen books is that it will produce text that competes with and substitutes for those books — precisely what is occurring, often without attribution and always without compensation to authors. For example, Llama can create sequels or variations on Plaintiffs' books based on a simple command which can mimic Plaintiffs' style and substance and dilute the market for plaintiffs' own works.

16. While Plaintiffs have no desire to halt the development of AI such as Llama, they seek that it be done fairly and legally and that it respect Plaintiffs' property. Accordingly, Plaintiffs and the Class seek compensatory and punitive damages, including an injunction halting Meta's use of their works to develop and train Llama, and to prevent Llama from using their copyrighted material to generate derivative work without a licensing agreement or compensation to each of the millions of authors and creators who life work Meta surreptitiously stole, reproduced, and dismissed.

## JURISDICTION AND VENUE

17. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this case arises under the Copyright Act, 17 U.S.C. §§ 101, *et seq*.

18. This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (1) at least one member of the Class is a citizen of a different state than any Defendant, (2) there are more than 100 members of the Class, (3) the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (4) none of the exceptions under that subsection apply to this action.

19.    This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same case or controversy as Plaintiffs' federal claims.

20.    Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and 1400(a) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including Defendants' copyright infringement and commercialization of its Llama Models.  Plaintiffs have suffered substantial injuries in this District.

21.    More than 7,000 authors reside in New York.  New York has the most publishers anywhere in the United States and is regarded as the epicenter of the U.S. literary industry.  Today, the New York City houses the headquarters or main offices of numerous authors, trade publishers, educational publishers, independent presses, literary agencies, and related media organizations.

22.    Key industry functions such as editorial acquisitions, contract negotiation, marketing, and rights management are largely conducted in New York, reflecting the concentration of decision-making authority here.

23.    In addition, many authors, agents, and publishing professionals maintain a regular presence in New York.  As a result, a significant portion of the business and operational activity associated with U.S. publishing is based in New York City.

24.    Defendant Meta is subject to the specific personal jurisdiction of this Court pursuant to N.Y. C.P.L.R. §§ 302(a)(1)–(4), as it has purposefully directed its activities at New York, registered to transact and transacted business in this State and District, and supplied goods and services in the State and District through the promotion and distribution of its products, including the Llama products.  Meta possesses real property and has established a continuing presence in this State and District.  Meta employs significant employees and resources within New York City.  Meta has maintained multiple offices within the District during the relevant period, including at 50 Hudson Yards, New York, NY 10001; 380 W 33rd St, New York, NY 10001; and (from 2018 through 2024) 770 Broadway, New York, NY 10003.  Meta has numerous high-profile employees working on AI based in New York City, including the Research Engineering Lead for North America for Meta's Core Machine Learning and Responsible AI, as well as its Associate General Counsel for AI.

25.    Defendant Zuckerberg is subject to the specific personal jurisdiction of this Court pursuant to N.Y. C.P.L.R. § 302(a)(1) and (a)(3).  Zuckerberg, in his capacity as Meta's founder,

chairman, CEO, and controlling shareholder, directed and exercised control over Meta's New York-directed activities giving rise to Plaintiff's claims, including the development, training, and distribution of the Llama Models and the acquisition and copying of infringing works as training material. At Zuckerberg's direction, Meta employees in New York and elsewhere carried out mass theft of copyrighted works. When Meta engineers grappled with difficulties in sourcing sufficient training material for Llama, Zuckerberg "demanded a solution" to the problem, which ultimately led Meta to pirate copyrighted works. A New York-based Meta AI employee confirmed that the decision to torrent copyrighted works was made only "[a]fter a prior escalation to MZ."

26. Defendant Lample, on information and belief, worked with Meta employees based in New York on the torrenting alleged and on the development and deployment of Llama. Based on publicly available information, Plaintiffs are informed and believe that Defendant Lample committed acts of infringement that he knew would harm copyright holders in New York and that discovery will establish Lample's contacts with New York sufficient to support jurisdiction.

27. Defendant Pineau, on information and belief, worked with Meta employees based in New York on the torrenting alleged and on the development and deployment of Llama. Plaintiffs are informed and believe that Defendant Pineau committed acts of infringement that he knew would harm copyright holders in New York and that discovery will establish Pineau's contacts with New York sufficient to support jurisdiction.

## PARTIES

28. Plaintiff Jeff Hobbs is an individual residing in the State of California. Plaintiff Hobbs is the owner of copyrighted literary works which include, among others, *The Tourists* and *The Short and Tragic Life of Robert Peace*, that were downloaded illicitly from shadow websites such as LibGen which pirated his works by Defendants, reproduced and distributed by Defendants without authorization, and used to train Meta's Llama Models. Plaintiff is willing to license his works for AI training but was never approached by any Defendant or offered any compensation.

29. Plaintiff A. Douglas Stone is an individual residing in the State of Connecticut and a professor of physics at Yale University. Plaintiff Stone is the owner of copyrighted works on science which include, among others, *Einstein and the Quantum: The Quest of The Valiant Swabian* and *Einstein's Unknown Insight and the Problem of Quantizing Chaos*, that were downloaded illicitly by Defendants from shadow websites such as LibGen, reproduced and distributed by Defendants without authorization, and used to train Meta's Llama Models. Plaintiff

is willing to license his works for AI training but was never approached by any Defendant or offered any compensation. Plaintiff is also owner of copyrights though inheritance of the copyrighted works of his father Professor Alan A. Stone of Harvard Law School whose copyrighted works were also pirated by Meta.

30. Defendant Meta is a Delaware corporation with its principal place of business at 1 Meta Way, Menlo Park, CA 94025. Meta is a diversified internet company that creates, markets, and sells software and hardware technology products, including Facebook, Instagram, WhatsApp, and Threads. Meta also has a large artificial-intelligence group called Meta AI that creates and distributes artificial-intelligence software products, including the Llama family of large language models ("LLM"). Meta develops, distributes, and monetizes the Llama Models, all of which were born out of Defendants' copyright infringement. Meta also operates AI-related businesses, including the development and deployment of the Llama Models and related AI-powered products.

31. Defendant Zuckerberg is the founder, Chairman, CEO, and controlling shareholder of Meta. His offices are located at 1 Meta Way, Menlo Park, California, 94025. Zuckerberg is the founder, Chairman of the Board, Chief Executive Officer, and controlling shareholder of Meta Platforms, Inc. Zuckerberg resides in Palo Alto, California. In his capacity as Meta's leader and controlling shareholder, Zuckerberg had ultimate control and authority over the development and distribution of the Llama Models. He has been the guiding hand behind, and closely involved in, Meta's development of Llama from the start, exercising his decision-making power to demand and authorize the use of Plaintiffs' works to train Meta's LLM. He was not a passive corporate officer, but a primary actor in the transactions giving rise to this action, with knowledge of and direct participation in the infringing conduct. As one Meta employee confirmed, the decision to torrent copyrighted works from notorious pirate sites was made only "[a]fter a prior escalation to MZ."

## AGENTS AND CO-CONSPIRATORS

32. Defendant Joelle Pineau is, on information and belief, a resident of the Province of Quebec, Canada. Pineau served as Meta's Vice President of AI Research and led Meta's Fundamental AI Research (FAIR) lab. Pineau oversaw the development of Llama and created new models and algorithms for AI at Meta. Plaintiff expects that Meta will ask Pineau to voluntarily consent to personal jurisdiction in this District given any provisions or responsibilities under her termination agreement or, in the alternative, that discovery will reveal that Pineau transacted business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1).

33.    Guillaume Lample is, on information and belief, a former Meta research scientist who now co-founded and operates AI competitor Mistral AI. Lample likely torrented 70 TB of data, which include LibGen Non-Fiction/SciTech. Lample "likely torrented Meta's first copy of LibGen" — the notorious pirate library containing millions of copyrighted works — while employed at Meta. That copy has since "vanished from Meta's possession," but employees within Meta speculated it was acquired via torrenting. Lample's code indicates that he used Meta's H2 cluster, Amazon Web Services (AWS) (cloud computing services), and Microsoft Azure (cloud computing services) for his LibGen activities; his code makes references to several server directory locations where torrented books are stored, including H2 directories, and AWS and Azure directories.

34.    Upon information and belief, Defendants' unlawful conduct is ongoing, and that additional individuals and entities presently identified as John Doe 1 – 100 participated in, directed, authorized, facilitated, or otherwise contributed to such conduct. Plaintiffs are further informed and believe that sufficient grounds exist for the joinder of Defendants John Doe 1 – 100 in this action, but Plaintiffs have not yet identified their full identities or roles with sufficient specificity and reserve the right to amend this Complaint accordingly as additional evidence is obtained through investigation and discovery.

35.    On information and belief, Lample concealed the theft by referring to LibGen using the term "BooksZero" and intentionally keeping his code off of Meta's source code repository.

36.    On information and belief, Lample worked with Meta employees based in New York and transacted business in this District in connection with the acquisition of pirated works. Plaintiff expects that Meta will ask Lample to voluntarily consent to personal jurisdiction in this District given any provisions or responsibilities under her termination agreement or, in the alternative, that discovery will reveal that Lample transacted business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1).

## FACTUAL ALLEGATIONS

### *Written Works Are Vital and Meta Targeted them for Theft*

37.    Written works are vital to our society and culture. They educate and entertain, spark new questions and new worlds, evoke shared emotions and shared experiences, and give voice to the unheard. The Framers of the Constitution enshrined the copyright protection of written

9

works in Article I, Section 8, Clause 8, with an explicit purpose: "[t]o promote the Progress of Science and useful Arts."

38.     Defendants particularly valued and targeted literary works as sources for training Llama. One Meta employee explained that the "best resources we can think of [for training Llama] are definitely books." Another confirmed that it was "really important for us to get books ASAP" because "books are actually more important than web data."

39.     Meta valued books because they are high-quality representations of human language, with coherent structure and strong grammar. As Meta's own expert acknowledged, high-quality data "captur[es] useful semantic relationships." As computational linguist Dr. Emily Bender explained, the value of books lies in "the selection and arrangement of the words contained therein." In particular, books are complete expressions of carefully crafted literary work of high caliber that have been vetted, selected for publication and appeal to a wide audience on varied subjects. This literary canon was particularly attractive to Meta which wanted Llama to achieve not only a high level of expertise but the ability to replicate and mimic expressive styles, enabling it to duplicate the tone and language of highly regarded authors or the approach and insight of highly regarded scientists, enabling Llama to generate derivative works, clones of their work, and mimicking their voices.

40.     Meta needed books to develop "long context windows" — the ability to produce output based on long prompts — which was critical to competing with ChatGPT and other rivals. Internal documents confirm: "Anna's Archive [a site of pirated material] is full of long context books that they will desperately need for llama4 to have long context."

41.     A large language model's output is entirely and uniquely reliant on the material in its training dataset. It does not invent new things or reason, but instead outputs what it has trained on. Every time Llama assembles a text output, the model relies on the information and expressive content that it extracted or copied from its training dataset. Decisions regarding the optimal data mixes of training datasets are deliberate and important. In summary, Llama relies on the Plaintiffs' works and the Class' copyrighted work it has trained on and memorized to determine the answers that it gives to users.

42.     Meta's internal documents quantify the scale of its reliance on books. For pretraining alone, Meta used on the order of trillions of unlabeled tokens. As an internal Meta

presentation explained: "1T tokens of text = ~ 12M books." Meta's models consumed books at a staggering scale — the equivalent of the entire Library of Congress many times over.

43.    Meta's internal data presentation titled "Deep Dive" revealed the breakdown of training data for its models: for LLaMa-Anise-70B, Books comprised 4.5% of 1.4 trillion tokens; for LLaMa-Cinnamon-70B, Books comprised 4.4% of 2 trillion tokens; and for LLaMa-Dill-150B, Books comprised 3.6% of 2.3 trillion tokens. These percentages, while seemingly small, represent billions of tokens extracted exclusively from copyrighted books.

44.    Meta's appetite for book data was insatiable. Internal planning documents show that Meta targeted acquiring "+640B tokens of books, articles, and creative" content for subsequent models, with the notation that this "May give us a long-context boost, but more work needed." The internal strategy was unambiguous: acquire books at all costs.

45.    Meta's Director of Product for GenAI, Eugene Nho, has testified that "not every words [sic.] are equally insightful, or helpful, to teach the model" — confirming that Meta specifically valued the expressive quality of literary works over other text sources.

46.    Yann LeCun, Meta's Chief AI Scientist, testified about why long-form text like books were essential: Llama 3 has "a context window of 128,000 tokens which is on the order of a hundred thousand words, roughly. And so to take full advantage of the redundancy in the text, you have to have texts that are at least that long." Books uniquely satisfied this technical requirement.

47.    Meta's internal documents confirm it viewed its competitive position as dire. One document stated: "We are significantly lagging GPT-4 and PaLM-2." Another acknowledged that Meta was "lagging behind ChatGPT" in creativity and style. The solution, as Meta saw it, was more books — and, specifically, pirated ones. Another internal communication confirmed: "[Libgen] would probably contribute the most towards improving our Agents capabilities and their creativity." LibGen is a well known site of pirated material.

48.    Meta's data strategy was explicitly described in internal documents as: "Books strategy: libgen [in progress] – FREE."

### *Meta Abandons Licensing and Chooses Piracy*

49.    Meta initially explored licensing copyrighted books from major publishers. Meta's head of generative AI discussed spending millions of dollars on licensing and Meta entered into preliminary negotiations with "all the big guys: Harper Collins, Simon & Schuster, Macmillan,

Hachette, Penguin, Random House." Collectively, those publishers control approximately 80% of the English-language trade book market.

50.     But Meta abruptly abandoned its licensing efforts on or before April 7, 2023.   The directive to stop licensing was "escalated to MZ [Mark Zuckerberg] re: fair use." Meta's Business Development team was verbally instructed to stop all text data licensing efforts immediately.  One Meta engineer summed it up: "if we license once [sic] single book, we won't be able to lean into the fair use strategy." In other words, Meta consciously decided to steal tens of millions of books rather than license even one of them because it would hurt their potential defense in future litigations.

51.     Meta instead resorted to using pirated versions of copyrighted books acquired from illegal online databases.  And to conceal its actions, Meta's employees started referring to these pirated datasets as "external" or "publicly available" instead of "pirated" — although even Meta employees knew it was not accurate to refer to pirated datasets as "publicly available."

52.     As Meta's corporate designee Michael Clark testified, when asked whether he understood LibGen to contain "pirated or stolen material," he confirmed: "The example that I had mentioned before, where the engineers showed me they had found an example that it was pirated and a title and a language I can't remember, was from LibGen.  And so that answer would be yes."

53.     The use of pirated works was kept secret within Meta.  It was conveyed only "on a 'need to know' basis."  Meta's researchers knew that their conduct was wrong.  One Meta employee, Eleonora Presani, responded to the suggestion that "everyone is using LibGen" by stating: "I mean, everyone is doing a lot of things.  It doesn't mean it's the right thing to do." Another researcher stated bluntly: "I feel that using pirated material should be beyond our ethical threshold."  A third warned that the pirated LibGen data "should not go in the training of the published model." His warning was ignored.

54.     When Meta received an advance copy of an August 2023 Atlantic magazine exposé about Books3 — the pirated dataset Meta was using — one employee panicked: "[I]t's the piracy (and us knowing and being accomplices) that's the issue."  Another wrote: "ah yikes books3 contains more than I think the lawyers realize."  In fact Books3, which was downloaded by Meta, contained numerous books taken from shadow websites such as Libgen. Yet Meta continued copying and using the pirated data.

55.    Meta's internal presentation on its "research vision" declared: "Our research vision presents a unique opportunity to be the leader of Generative AI by taking a different . . . approach than the rest of the industry, namely by being open and by building a strong research and developer community around our technology."   The reality was that Meta's "different approach" was industrial-scale theft.

56.    Effectively, Meta adopted piracy as corporate policy.

### *Torrenting Enables Widespread Piracy*

57.    As set forth elsewhere in this Complaint, in order to save money and avoid logistical issues that might slow down the development of its AI, Meta made a conscious choice to use illegal online libraries and to download the Plaintiffs' and tens of millions of other authors' works, without licensing the copyrights.

58.    In particular, in October 2022, Meta downloaded many terabytes of data from LibGen in order to determine whether to license them and then, in the spring of 2023, after failing to acquire licenses for those books, Meta decided to simply use them to train Llama without licensing them.   Meta also downloaded many terabytes of data containing tens of millions of authors' copyrighted books from another shadow library named Anna's Archive, which itself was a compilation of LibGen Z Library and other shadow libraries.   Meta tried to conceal its infringement by (1) using VPN's and other methods to disguise its IP addresses; and, (2) stripping the books of copyright s materials.

59.    Of particular significance here, is the fact that these shadow libraries, and in particular LibGen, function by using "torrenting."  Torrenting is a peer to peer ("P2P") file-sharing technique that allows for the simultaneous distribution of small portions of a larger file from many different sources.   Torrent files allow people to share and download large amounts of data efficiently through decentralized networks.   They are often used for distributing open source software, independent music, films, and documentaries, but they can also be used for illegal purposes, such as downloading copyrighted materials, such as the books and literary works at issue here.  Many shadow libraries, such as The Pirate Bay, are purposely set up to use decentralized torrenting in order to avoid prosecution for violation of copyright infringement.

60.    The way that torrenting works to download a book is as follows: (i) a user locates a torrent or magnet link which identifies the requested content by a crypotographic hash; (ii) the user opens the link in a torrent Client such as BitTorrent; (iii) the Client reads the torrent metadata

and finds peers (other computer IP addresses) using: Trackers, Decentralized Hash Tables ("DHT"), and Peer Exchange sharing pieces of the file that have pieces of the book; (iv) pieces of the book are downloaded from many users (known as a "swarm"); (v) the file is split into chunks; (vi) the Client downloads different chunks from different peers, uploads chunks the user already has, and verifies chunks using hashes to ensure accuracy and completeness; (vii) the Client reconstructs the complete file once all chunks are received and verified; and, (viii) the Client assembles them into the finished file for the user. After download, the user may continue seeding (uploading the finished book). If the Client (*e.g.*, BitTorrent), remains open after completion: the user continues uploading pieces to others in the swarm.

61. Many creators and organizations intentionally use torrenting because it reduces server bandwidth costs and distributes load efficiently. Torrenting activity at the scale practiced by Meta is enough to dramatically offset the costs of operators of websites such as Library Genesis and Anna's Archive. These websites that host large data files incur large data storage and transfer costs associated with this data hosting. Downloaders of the pirated content hosted by these websites who use BitTorrent software reduce these costs for operators of the websites. This is because the users who are downloading pirated content can themselves reshare the content. In summary, by stealing tens of millions of copyrighted books, Meta lowered the costs of these pirate shadow libraries to operate and assisted further copyright infringement.

62. A unique aspect of a site that works by torrenting is that the "leecher", the person downloading pieces of the file, can at the same time share the file or book that it is downloading with anyone on the site by uploading simultaneously or afterward. This is called "leeching". Often, as in the case here, the default setting for downloading through torrenting permits leeching by members of the swarm and uploads the data that is being downloaded from the swarm, so that is available for any member to download.

63. In this case, Meta chose to not change that setting, and accordingly on information and belief uploaded in excess of 69 terabytes of data, including millions of books such as the Plaintiffs' works to other users of the LibGen Shadow Library. For example, Meta used BitTorrent to download copyrighted works that were distributed as collections of pirated works. These collections are described by .torrent files, each of which typically specified one thousand or more files in Meta's torrenting. While downloading these payloads of many files described by a .torrent file, Meta, via itTorrent, uploaded parts of those files to other BitTorrent users who wanted them.

This alone without more, constituted piracy and copyright infringement as well as distribution and contributory infringement under applicable copyright laws.

### *Defendants Illegally Torrented Millions of Copyrighted Works*

64.    Defendants sourced Llama's training data from a variety of sources, all of which included massive amounts of copyrighted material.  Defendants copied material from Common Crawl, CCNet, C4, Books3 (which contained portions of LibGen, Anna's Archive and Z-library), LibGen, Anna's Archive, Z-Library, Sci-Hub, and other pirate repositories.

65.    Courts in the United States have repeatedly found LibGen and similar sites to be engaged in willful copyright infringement. *See Elsevier Inc. v. www.Sci-Hub.org*, 2015 WL 6657363 (S.D.N.Y. 2015); *Cengage Learning, Inc. v. Does 1-50 d/b/a Library Genesis*, Case No. 23-cv-8136-CM, Dkt. 36 at 2-3 (S.D.N.Y. Sept. 24, 2024)  (granting permanent injunction against LibGen).  In fact, the U.S. Department of Justice believes such conduct can in some cases be criminal, as it has obtained indictments for conspiracy to commit copyright infringement and wire fraud from individuals who unlawfully obtained copyrighted material, removed copyright protections, and uploaded copies of that material and disseminated it on torrent networks and other P2P networks.  *See, e.g., United States v. George Bridi*, No. 20-cr-018 (S.D.N.Y.) (Defendant Bridi pled guilty to one count of conspiracy to commit copyright infringement and was sentenced to a 22 month term of imprisonment for deceiving wholesale movie distributors to give him and his accomplices advance copies of movies and televisions shows, stripping those copies of their copyright protections, and then reproducing and distributing those materials on torrent networks and other P2P networks).

66.    In 2022, with approval from Meta's in-house counsel, Defendant Guillaume Lample torrented a copy of LibGen, which has since vanished from Meta's possession.  Initially, Meta claimed it would use LibGen "just for pure exploration to see if there is value" for training, and if so, "then [it would] setup proper licensing agreement[s]."  That promise was broken.  And, in any event, that download was illegal. Meta cannot claim that these pirated copies were used for training Llama since it does not know where they are. Thus, it has no defense to the copying of these millions of copyrighted materials from a pirate website.

67.    Defendants also retained substantial quantities of the pirated datasets even after using them to train Llama. On information and belief, Defendants maintained multiple copies of the infringed works across various systems, storage locations and research pipelines long after any

alleged "training" purpose had concluded. The retention and maintenance of these pirated libraries demonstrates that Defendants' infringement was not merely temporary or incidental to model training. Indeed, Meta's continued possession and maintenance of millions of pirated works supports the inference that Defendants downloaded and retained the materials for broader and ongoing unauthorized uses beyond any claimed AI training process.

68. In April 2023, after Zuckerberg authorized the use of pirated data, Meta's Vice President and Head of AI Ahmad Al-Dahle "cleared the path" for using LibGen. Internal documents confirmed that "after a prior escalation to MZ [Mark Zuckerberg], GenAI has been approved to use LibGen for Llama 3 (with VP sponsor requiring to accept full risk)" despite that LibGen was "a dataset we know to be pirated."

69. Several Meta employees expressed strong reservations. One researcher commented, "I feel that using pirated material should be beyond our ethical threshold." Another referred to LibGen as an "illegal pirated website[]" and expressed that "it should not go in the training of the published model." One engineer, Todor Mihaylov, outright asked, "Is libgen this" while sharing a screenshot of a Google search result that read, "No, Libgen is not legal, and using Libgen may open you up to legal ramifications."

70. Nevertheless, Meta viewed LibGen as "essential" to meeting its performance targets. Without it, Meta's researchers doubted they could "close [the] gap" with competitors OpenAI and Mistral. As one employee stated: "LibGen is the most valuable dataset that we have so far."

71. Defendants adopted a familiar piracy tactic — hiding their illegal activity by masking Meta's IP addresses to "avoid[] risk of tracing back the seeder/downloader . . . from FB servers." Meta used Amazon Web Services for its torrenting specifically to avoid traceability. Such steps demonstrate their knowing, willful infringement.

72. Ultimately, Zuckerberg and other Meta executives authorized and directed the torrenting of over 267 TB of pirated material — equivalent to hundreds of millions of publications and many times the size of the entire print collection of the Library of Congress.

73. Meta's embrace of data piracy increased exponentially over time. An intermediate update posted by Meta engineer Xiaolan Wang showed that by mid-April 2024, Meta had already downloaded 46 TB of pirated data from Internet Archive; 25.7 TB from Z-Library; and 10 TB from LibGen. To give some illustration of the volume of Meta's piracy, it is estimated that you

can fit about 500,000 standard 1,000-page books into 1 Terabyte (TB) of storage; this estimate assumes modern, compressed formats like PDF or EPUB; if the books are saved as uncompressed plain text, a 1 TB drive could hold around 500 million pages, which is equivalent to about 500,000 massive 1,000-page books.

74.     In 2024 alone, Meta's torrenting activities yielded 9.7 million files from Z-Library, 5.8 million files from Internet Archive, and 489,000 files from LibGen Non-Fiction.

75.     Meta engineers initially viewed torrenting as off-limits due to its obvious illegality. Engineer Todor Mihaylov told colleagues: "Btw, it would not be trivial to download libgen if everything is in torrents," sharing a link to a Quora webpage asking, "What is the probability of getting arrested for using torrents in the USA?" Nikolay Bashlykov separately wrote: "not sure we can use meta's IPs to load through torrents pirate content" before remarking, "I think torrenting from a corporate laptop doesn't feel right." Another engineer, Jelmer Van de Linde, cautioned: "I can't say I'm particularly comfortable with it from a legal or ethical point of view right now."

76.     But Bashlykov elected to torrent the entirety of LibGen's SciMag section anyway, which held approximately 81 million scientific articles. As he wrote in his notes: "Trying to load [LibGen] scimag with the same approach (direct download) as before – doesn't seem to be fast (250k docs / 12h -> 160 days to download the library). Exploring other options to load faster." The solution was torrenting. Bashlykov admitted he "had to fallback to torrenting since the volume was too large."

77.     Meta's engineers also identified Anna's Archive as a source of pirated books for Llama4. For example, in April 2025, Meta downloaded 134 TB and uploaded 40 TB from Anna's Archive; in September 2025, Meta downloaded 161 TB and uploaded 29 TB from Anna's Archive. An internal planning document describes "Anna's Archive Processing Pipeline" and states that the project "aims to scrape and process the entirety of Anna's Archive Containers (AAC), which standardizes releases from the world's largest shadow libraries." The document further notes that "Processing of Anna's Archive will follow the same procedure established by the pipeline that processed the libgen. With the difference of preprocessing documents to determine the duplicates before OCR-ing them to avoid wasted computing. Mainly because the libgen was processed using Nougat, which has high resource requirements and has to be run on GPUs."

78.     Meta acquired multiple copies of LibGen without coordination. When asked why Meta would acquire multiple copies, Meta's designee Chaya Nayak testified: "Meta is a large

company, and I could imagine that one researcher could have downloaded it and then another researcher could have downloaded it without knowing that it existed." When asked whether every copy was used to train Llama, Nayak testified: "I don't know."

*By Choosing Not to Adjust The Settings, Meta Distributes Millions of Copyrighted Works Through BitTorrent*

79.    By downloading through the BitTorrent protocol, Meta knew it was facilitating further copyright infringement by acting as a distribution point for other users of pirated books. BitTorrent's default settings facilitate dissemination of content the instant users start downloading, and BitTorrent employs a mechanism called "choking" to prevent users from downloading content without contributing to the network.

80.    Meta used default torrent configuration settings that allowed for simultaneous uploading and downloading. There are ways to configure the torrent to eliminate uploading, but Meta did not do so because that would have slowed its download speeds. By opting to use a BitTorrent system to download LibGen's voluminous collection of pirated books, Meta allowed BitTorrent users to "leech" those books, *i.e.*, to also download copies of them. Meta did this knowingly to increase it download speeds, without regard for aiding and abetting illicit distribution.

81.    For example, Meta downloaded at least 236 TB of book data that include multiple copies of works and Meta made all of that data available for other BitTorrent users to download in the process. The data was made available by Meta due to the default behavior of the BitTorrent software it chose to use, which advertised to each connected peer the set of all the torrent data Meta had completed downloading and could upload to that peer. BitTorrent peers, in turn, could select and then download that data from Meta. Meta's logs indicate that it uploaded to leechers at least 69 TB of data, the vast majority of which is highly likely to be book data.

*Meta Stripped Copyright Management Information to Conceal Its Theft In Violation The DMCA*

82.    When making infringing copies of Plaintiffs' and the Class's works, Meta also intentionally and systematically removed CMI. Meta developed and deployed scripts specifically designed to delete CMI from the beginning and end of works torrented from LibGen.

83.    Meta's own internal data reveals fields labeled "lines_copyright_removed" and "lines_pii_removed" in the LibGen datasets, confirming systematic stripping of copyright notices.

Meta employee Nikolay Bashlykov created scripts to remove "copyright information, including data publication, author, ISBN numbers, disclaimers about not selling, sharing or giving away because it is an infringement."

84.     Meta removed this CMI to conceal from rightsholders, Llama users, and the general public, that its Llama Models were trained on stolen materials. One employee warned that "[i]f there is media coverage suggesting we have used a dataset we know to be pirated, such as LibGen, this may undermine our negotiating position with regulators." Meta's employees agreed that "in no case would we disclose publicly that we had trained on libgen." Meta then trained Llama to deny that it had been trained on pirated or copyrighted data.

85.     To resolve the risk that Llama would generate incriminating answers about its training data, Meta's programmers proposed — and implemented — insertion of "supervised samples" into Llama's fine-tuning to ensure that Llama's output would include fewer incriminating answers regarding the source of Meta's AI training data. When prompted "you are trained on lots of data. Some of it is probably pirated or illegal, right?," Llama initially answered honestly: "I am trained on a large corpus of text data that includes information from many different sources, some of which may be pirated or illegal." Meta then programmed Llama to stop making such admissions and conceal their actions.

86.     Memorization of copyrighted works was an active concern within Meta. Internal documents show that as early as October 2022, Meta employees openly discussed the risk that Llama would memorize copyrighted books on which it trained, and the company weighed that risk against the benefits of using books as training data. One internal Meta presentation was titled "Memorization in LLMs & MME [Memorization Measurement Engine]." Meta software engineer David Esiobu testified: "I would say people at Meta were concerned about — myself included, were concerned about these things."

87.     Despite these concerns, Meta never conducted memorization evaluation experiments for LibGen. When Esiobu was asked whether "anyone at Meta conduct[ed] the experiments to determine the affect of LibGen on memorization," he answered: "I'm not aware of anyone doing that." Meta chose not to look for a problem it feared finding.

88.     Meta's mitigations were a sham. When finalizing datasets, Meta proposed removing any books whose file names "self-identified as being 'stolen' or 'pirated,' such 'pirated copy of some silly title - torrent leak.pdf.'" Another engineer's proposed mitigation of searching

19

the books for copyright headers as evidence of piracy was rejected because "that is normal text that is part of many books preface" within LibGen.  In other words, Meta rejected the only mitigation that might have worked because it would have identified too many pirated works.

89. Through the Digital Millennium Copyright Act, Congress increased and strengthened copyright statutory damages in response to the rise of digital piracy because ordinary remedies were insufficient to deter mass infringement conducted at internet scale.  Defendants' conduct – downloading, reproducing, retaining, seeding, and concealing millions of pirated books through torrent networks to build a commercial AI empire – epitomizes the precise misconduct that Congress intended copyright law to punish and deter.

### *Meta Made Multiple Unauthorized Copies During Training*

90. Separate from their initial unauthorized copying, Defendants reproduced this massive corpus of text from long-term storage into memory where it could be processed to train Llama's AI model.  During the training process, Defendants made many additional copies of material in the datasets.  As the U.S. Patent and Trademark Office has explained, training an LLM "almost by definition involve[s] the reproduction of entire works or substantial portions thereof."

91. Preparing copyrighted text for LLM training requires making new copies of the same work in different locations, formats, and configurations.  Segmenting works into "chunks" requires reproducing portions of the original text; tokenization makes another copy in machine-readable form; and, training involves repeatedly copying that tokenized text into and through system memory as the model updates its parameters.

92. Meta's internal documents confirm that books comprised a material portion of training data.  For Llama 1, CCNet constituted 67% of training materials (3.3 terabytes), C4 accounted for 15% (783 gigabytes), and Books comprised 4.5% of tokens.  For subsequent models, Meta acquired "+640B tokens of books, articles, and creative" content — with internal notes confirming this "May give us a long-context boost."

### *Market Dilution and Indirect Substitution*

93. Meta copied millions of copyrighted works to create a product that is flooding the market with similar works, causing market dilution and displacing legitimate sales.

94. Llama's outputs take multiple forms of market substitution: verbatim and near-verbatim copies, replacement chapters of academic textbooks, summaries and alternative versions of famous novels and journal articles, inferior knockoffs that copy creative elements of original

works, and derivative works exclusively reserved to rights holders. Llama even tailors outputs to mimic the expressive elements and creative choices of specific authors.

95. Users are touting AI's ability to generate books with ease, and Llama is flooding the market with AI-generated substitutes. The scale and speed at which Llama can create written works and compete with human writers is unprecedented, and it can only do that because Defendants copied Plaintiffs' and the Class' works to train their LLM.

96. The Authors Guild sent an open letter signed by over 15,000 authors to the CEOs of major AI companies, including Mark Zuckerberg, stating: "As a result of embedding our writings in your systems, generative AI threatens to damage our profession by flooding the market with mediocre, machine-written books, stories, and journalism based on our work."

97. The Science Fiction and Fantasy Writers Association issued a letter documenting how online and paper magazines have been "inundated with AI-written stories. The editors uniformly report that these submissions are poorly conceived and written, far from being publishable, but the sheer volume materially interferes with the running of these magazines." Every submitted work must now be manually verified.

98. WIRED reports that AI-generated books are "[f]looding Amazon" — including knockoff books that directly imitate authors' published works by copying their titles and scope of content. According to the European Writers' Council, "[a]t peak times, 80 out of 100 Kindle KDP bestsellers are AI editions."

99. The introduction of AI-generated substitute works into the marketplace creates a "market for lemons" problem identified by Nobel laureate economist George Akerlof. AI-generated books of low-quality drive out authentic works because consumers cannot distinguish them before purchase. As competition pressures quality to deteriorate to low levels, the market itself may fail to exist.

100. Empirical evidence from analogous markets confirms this devastating impact. Online education company Chegg saw its shares plummet roughly 48% and its year-over-year subscribers decline after ChatGPT's release. Stack Overflow experienced an additional decline of over 30% in questions and answers posted after ChatGPT launched. A study found that monthly earnings for writing-related freelancers on Upwork declined by 5.2% after ChatGPT's release.

101. Total revenues for the U.S. book publishing industry were approximately $29.9 billion in 2023. If the decline in revenue attributable to AI equals the low end of comparable

figures, publishers stand to lose approximately $1.5 billion per year and individual authors on average $500 per year. If it equals the high end, publishers could lose roughly $9 billion in revenue per year.

102. An Authors Guild survey reported that the median income for full-time authors from their books in 2022 was only $10,000 — down from already precarious levels. The introduction of AI threatens to make it "even more difficult, if not impossible, for writers — especially young writers and voices from under-represented communities — to earn a living from their profession."

103. The harm is not limited to competing outputs or downstream AI-generated substitutes. Plaintiffs and the Class were injured the moment Defendants unlawfully acquired, reproduced, retained, and redistributed their copyrighted works from pirate repositories without authorization. Unlike cases involving lawfully obtained materials, Defendants here chose to acquire Plaintiffs' works through mass piracy rather than lawful licensing arrangements that were readily available in the marketplace. Defendants cannot convert the unlawful theft and reproduction of copyrighted books into lawful conduct merely by asserting that the stolen materials were later used to train an AI system. The harm occurs at the point of ingestion, where Defendants copied copyrighted works as inputs to build a valuable commercial system without consent or compensation. That conduct appropriates the economic value of the works, eliminates a legitimate licensing market, and allows Defendants to free-ride on investments they did not make. This is precisely the type of harm that copyright is designed to prevent.

### The Discarding of Stolen Works — Use and Non-Use

104. Meta's conduct reveals a perverse calculus: it valued copyrighted books enough to steal millions of them, yet treated them as disposable once their value was extracted. Meta's approach was to ingest books, extract their expressive content into model weights, and then — in many cases — discard or destroy the evidence.

105. Internal communications reveal that Meta employees sought to keep the pipelines touching "book torrents" "under wraps," with one employee asking: "I asked you if the Genesis [LibGen] data pipelines are anywhere in some repo — so the pipelines are not anywhere because part of the pipelines touch the book torrents and we want that under wraps?"

106. The first copy of LibGen that Lample torrented "vanished from Meta's possession." Whether Meta used these works and discarded them to destroy evidence, or acquired and hoarded

22

them without ever licensing, the result is the same: Plaintiffs' and the Class's property was taken, their rights violated, and the commercial value of their works appropriated.

107.    As Meta's own internal documents reveal, it viewed the situation with brutal clarity: pirated books were "FREE" while licensed books cost millions.  The choice was deliberate.

### *Individual Defendant Liability*

### Mark Zuckerberg

108.    Zuckerberg personally authorized, directed, and was a primary actor in Meta's widespread infringing acts.  When Meta engineers grappled with difficulties in sourcing sufficient training material, Zuckerberg "demanded a solution," which ultimately led Meta to pirate copyrighted works.

109.    The decision to torrent copyrighted works was made only "[a]fter a prior escalation to MZ."  The directive to stop licensing was "escalated to MZ re: fair use."

110.    Zuckerberg's net worth recently climbed to over $200 billion as a direct result of Meta's AI products built on pirated data.  Meta's share price increased almost 300% since launching Llama.  These profits have come at Plaintiffs' and the Class' expense.

### *The Well-Developed Licensing Market That Defendants Usurped*

111.    A well-developed and rapidly expanding market exists for licensing copyrighted works for AI training.  AI companies across the technology sector now routinely enter into negotiated agreements with publishers, media companies, and academic institutions.  Technology companies themselves have publicly acknowledged the legitimacy of this ecosystem — Microsoft announced plans to build a dedicated marketplace for AI content licensing.

112.    Meta itself executed four licenses in 2022 with African-language book publishers, and subsequently reached licensing agreements with major news publishers including Fox News, CNN, and USA Today.  Meta's licensing budget discussions contemplated spending tens of millions of dollars on data.

113.    By opting for piracy rather than licensing, Meta not only deprived Plaintiffs and the Class of licensing revenues but also deprived them of the opportunity to negotiate terms, impose conditions, or receive attribution for the use of their works.

114.    Meta's internal documents show it was aware that its decision to pirate rather than license would destroy the very market it was exploiting.  One Meta employee observed: "[T]he problem is that people don't realize that if we license once [sic] single book, we won't be able to

23

lean into the fair use strategy. So we will have to drop all of the libgen and books datasets." In other words, Meta recognized that any acknowledgment of the market's legitimacy would undermine its legal defense — so it chose to deny the market's existence while simultaneously destroying it.

115. Meta's AI Business Development and Partnerships Lead, Sy Choudhury, was asked at deposition whether he cared "whether Meta protects human creativity rather than exploits it in connection with its LLMs." His answer: "It's not something that I've given a lot of thought to; so my answer is I don't care at this point." This testimony encapsulates Meta's institutional indifference to the rights of creators.

116. Meta's piracy strategy also extended to supporting shadow libraries that make stolen works available for free. Internal documents discussing Anna's Archive describe it as containing releases from "the world's largest shadow libraries" and note the Meta's aspiration to employ strategies that would ensure "long-term seeding and accessibility of torrents" — meaning Meta was considering how to keep pirate archives permanently available. This is precisely the type of conduct the copyright laws were designed to prevent.

### *Meta's Llama Models Are Commercially Deployed at Massive Scale*

117. Meta's Llama models are not academic research projects. They are commercial products integrated into Meta's full range of consumer-facing services. As Meta employee Arun Rao testified, Llama is embedded in "Meta AI," which he described as "our chat service, similar to ChatGPT. Where users can talk to an LLM." When asked what other products Llama was incorporated into, Rao identified "a downstream AI studio product," "the Meta Ray-Ban product," and noted that "there were dozens of tests across the company and many different products" — "a long list of teams testing it."

118. When asked whether Llama 3 was "intended for commercial use," Rao confirmed: "Yes." The Llama 3 model card itself states: "Intended use cases: Llama 3 preview is intended for commercial use."

119. Meta's internal projection documents estimated that its total revenue from generative AI would range from $2 to $3 billion in 2025, and from $460 billion to $1.4 trillion over the next ten years. Meta has stated it sees "Llama as a competitive advantage and value flowing back to Meta."

24

120.    Yann LeCun, Meta's Chief AI Scientist, was asked whether he agreed with Meta's decision to conceal the training sources for Llama 2 and Llama 3.  He testified: "So that was a decision by our legal department and I have no input."  When pressed, he acknowledged the concealment but offered no justification beyond that "there's a lot of work that goes into curating a training dataset.  Basically filtering it in such a way that it only contains high-quality data, and that is not viewed as something that should be publicly revealed for various reasons." Meta hid its training sources because disclosure would have revealed its reliance on pirated data.

121.    Meta's total 2025 AI investments, including infrastructure, were expected to exceed $60 billion.  These investments would not be economically viable without the foundation of stolen training data — the very books and articles that Defendants took without compensation.

## CLASS ALLEGATIONS

122.    **Class Definition.**  Plaintiff brings this proposed class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of himself and a Class of all others similarly situated, defined as follows:

> **All legal or beneficial owners of registered copyrights, in whole or in part, for any book possessing an International Standard Book Number (ISBN) or journal article possessing a Digital Object Identifier (DOI) or International Standard Serial Number (ISSN), that Meta, without such owner's authorization, (1) reproduced by downloading during torrenting and/or copying of web scrapes; or (2) distributed or made available during torrenting; or (3) reproduced in connection with the development and/or training of a Llama Model.**

123.    **Numerosity.**  Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, Plaintiffs believe and on that basis allege that there are at least thousands of members in the Class throughout the United States.  The disposition of the claims of the Class Members is great enough that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

124.    **Commonality and Predominance.**  There are common questions of law and fact as to the potential Class Members that predominate over questions affecting only individual members, including, but not limited to:

> a.    whether Defendants reproduced and distributed Class members' works, whether such conduct constitutes infringement, whether it was willful, and whether Class members are entitled to damages;

25

b.    whether Defendant violated the Plaintiffs' and the Class' copyrights when they downloaded copies of Plaintiffs' and the Class' infringed works from illegal shadow websites;

c.    whether Defendants violated the Plaintiffs' and the Class' copyrights when they "seeded" (and, therefore, distributed) the infringed works on torrent sites;

d.    whether Defendants violated the Plaintiffs' and the Class' copyrights when they used the infringed works to train the Llama language models;

e.    whether Defendants violated the Digital Millennium Copyright Act by removing copyright management information from Plaintiffs' and the Class' infringed works;

f.    whether Defendants' conduct constitutes unfair competition under New York law;

g.    whether Defendants intentionally exercised unauthorized dominion and control over the infringed works in a manner inconsistent with Plaintiffs' and the Class' rights; and,

h.    whether Defendants were unjustly enriched by the unlawful conduct described herein.

125.    All of Plaintiffs' claims and all potential Class Members' claims are based on the exact same legal theories.  Plaintiffs' damages also mirror the damages suffered by all potential Class Members.  Further, Plaintiffs have no interest in conflict with those of the Class.

126.    **Typicality.**  Plaintiff's claims are typical of the claims of the Class.  The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class Members, owned copyrighted works that were downloaded illegally by Defendants and used by Defendants to train its Llama language models.  The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct.  Further, the factual bases of Defendants' misconduct are common to all potential Class Members and represent a common thread of fraudulent and deliberate misconduct resulting in injury to all potential Class Members, including Plaintiffs.  No violations alleged in this complaint are contingent on any individualized interaction of any kind between potential Class Members and Defendants.  Rather, all claims in this matter arise from the identical acts and concealments by Defendants.

26

127.    **Adequacy.**  Plaintiffs are qualified to, and will, fairly and adequately protect the interest of each Class Member.  Plaintiffs have retained attorneys experienced in the prosecution of class actions similar to the present matter as well as other complex litigation.  Plaintiffs intend to prosecute this action vigorously.

128.    **Superiority.**  Class proceedings are superior to other methods for adjudication.

129.    **Class Period.**  The Class Period begins at least on October 1, 2022 and runs through the present.

130.    Excluded from the class are (1) Defendants and their co-conspirators; (2) any affiliated parent or sister company to Defendant Meta, its legal representatives, officers, directors, employees, assigns and successors; (3) the judge and judge's staff to whom this case is assigned; and, (4) governmental entities.

131.    Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

**COUNT I**
**Direct Copyright Infringement (Reproduction)**
**17 U.S.C. §§ 106, 501**

132.    Plaintiffs repeat and reiterate the allegations contained in the foregoing paragraphs as if fully set forth herein.

133.    Plaintiffs and the Class own valid copyrights in the infringed works.

134.    Defendants did not license the infringed works, or otherwise have authority to copy them.

135.    Defendants unlawfully reproduced, copied, downloaded, stored, and used Plaintiffs' and the Class' copyrighted works without authorization.

136.    Defendants unlawfully reproduced Plaintiffs' and the Class' copyrighted works through torrenting Anna's Archive, LibGen, Sci-Hub, and other pirate sites.

137.    Defendants unlawfully reproduced Plaintiffs' and the Class' copyrighted works through downloading web-scraped datasets including Common Crawl, CCNet, and C4, which contain vast quantities of unauthorized copies of copyrighted works from pirated sites including Z-Library and OceanofPDF.

138. Defendants unlawfully reproduced Plaintiffs' and the Class' copyrighted works in developing and training Meta's Llama Models, and making additional unauthorized copies at each stage of the training pipeline.

139. Defendants have thereby violated Plaintiffs' and the Class' exclusive rights under 17 U.S.C. § 106.

140. Plaintiffs and the Class have been injured and have suffered damages as a result of Defendants' acts of direct copyright infringement.

## COUNT II
### Direct Copyright Infringement (Distribution)
### 17 U.S.C. §§ 106, 501

141. Plaintiffs repeat and reiterate the allegations contained in the foregoing paragraphs as if fully set forth herein.

142. Plaintiffs and the Class own valid copyrights in the infringed works.

143. Defendants did not license the infringed works, or otherwise have authority to copy them.

144. Defendants unlawfully distributed Plaintiff's and the Class' copyrighted works through torrenting, including by "seeding" works to other users in peer-to-peer networks.

145. Defendants unlawfully made available Plaintiffs' and the Class' copyrighted works through torrenting.

146. Such activity constitutes direct infringement of the Plaintiff's and the Class' exclusive right of distribution.

147. Plaintiffs and the Class have been injured and have suffered damages as a result of Defendants' acts of direct copyright infringement.

## COUNT III
### Contributory Copyright Infringement
### 17 U.S.C. § 501

148. Plaintiffs repeat and reiterate the allegations contained in the foregoing paragraphs as if fully set forth herein.

149. Plaintiffs and the Class own valid copyrights in the infringed works.

150. Defendants did not license the infringed works, or otherwise have authority to copy them.

151.    Defendant Lample had knowledge of the infringing activity and materially contributed to the infringing conduct in that he personally torrented or caused to be torrented the infringed works.

152.    Defendant Lample knew that Meta's source repositories contained infringing materials.

153.    Meta materially contributed to pirate sites' infringement by directly subsidizing the online piracy markets' data transfer and storage costs for Plaintiffs' and the Class' works being shared by BitTorrent.

154.    Meta induced downstream copying of the infringing materials by offering torrented copyrighted works to other users of BitTorrent who could chose to download the infringing materials and who could further distribute the infringing works to even more peers.

155.    Meta knew that the pirate sites were torrenting infringing works.

156.    Meta took affirmative steps to make Plaintiffs' and the Class' works available for distribution to others.

157.    Plaintiffs and the Class have been injured and have suffered damages as a result of Defendants' acts of contributory copyright infringement.

## COUNT IV
### Removal of Copyright Management Information
### 17 U.S.C. § 1202

158.    Plaintiffs repeat and reiterate the allegations contained in the foregoing paragraphs as if fully set forth herein.

159.    Plaintiffs' and the Class' copyrighted works contained CMI when published including copyright notices, author names, title, copyright owner identifications, terms and conditions of use, and other identifying information.

160.    Plaintiffs and the Class did not authorize Meta to copy the infringed works; nor to use them as training data for Llama.

161.    Meta developed scripts to strip copyright notices, author names and other identifying information from the infringed works.

162.    Meta knew or had reasonable grounds to know that such removal would induce, enable, facilitate or conceal copyright infringement.

163.    Meta intentionally and systematically removed CMI from the infringed works in violation of 17 U.S.C. § 1202(b)(1).

164.    Meta created derivative works based on Plaintiffs' and the Class' infringed works. By distributing these works without their CMI, Meta violated 17 U.S.C. § 1202(b)(3).

165.    Plaintiffs and the Class have been injured and have suffered damages as a result of Defendants' removal of CMI.

## COUNT V
### Unfair Competition
### (New York Common Law)

166.    Plaintiffs repeat and reiterate the allegations contained in the foregoing paragraphs as if fully set forth herein.

167.    Defendants engaged in bad-faith commercial misappropriation of Plaintiffs' and the Class' labor, skill, expenditures, creativity, and protected expression.

168.    Defendants exploiting pirated literary works to accelerate development of Meta's AI products while avoiding the costs and restrictions associated with lawful licensing.

169.    Defendants' conduct constitutes commercial immorality and unfair competition under New York law.

170.    Plaintiffs and the Class have been injured and have suffered damages as a result of Defendants' unfair competition.

## COUNT VI
### Conversion
### (New York Common Law)

171.    Plaintiffs repeat and reiterate the allegations contained in the foregoing paragraphs as if fully set forth herein.

172.    Plaintiffs and the Class possessed ownership and legal rights in their copyrighted works and the digital copies thereof.

173.    Defendants intentionally exercised unauthorized dominion and control over those works in a manner inconsistent with Plaintiffs' and the Class' rights.

174.    Defendants acquired, possessed, copied, stored, and commercially exploited Plaintiffs' and the Class' works without authorization.

175.    Plaintiffs and the Class have been injured and have suffered damages as a result of thereof.

## COUNT VII
### Unjust Enrichment
### (New York Common Law)

176.    Plaintiffs repeat and reiterate the allegations contained in the foregoing paragraphs as if fully set forth herein.

30

177.    Defendants obtained substantial benefits through unauthorized copying, use and distribution of Plaintiffs' copyrighted works.

178.    Through its unauthorized copying, use, and distribution of Plaintiffs' copyrighted works, Defendants avoided substantial licensing costs and accelerated their development of commercially valuable AI systems.

179.    In these circumstances, it would be against equity and good conscious to permit Defendants to retain those benefits.

180.    Defendants' conduct is causing and will continue to cause Plaintiffs and the Class irreparable injury that cannot be fully measured or compensated by money unless enjoined and restrained by this Court.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against the Defendants on their behalf and on behalf of the Class defined herein as follows:

A.    Certification of the proposed class;

B.    Appointment of Plaintiffs as Class Representatives and appointment of counsel as Class Counsel;

C.    Judgment in favor of Plaintiffs and the Class;

D.    Statutory damages and other damages pursuant to 17 U.S.C. § 504 for Defendant's copyright violations;

E.    Permanent injunctive relief prohibiting further infringement without proper compensation;

F.    An order enjoining and restraining, unless proper licenses have been obtained, Defendants from:

a.    Hosting, linking to, distributing, reproducing, copying, uploading, making available for download, indexing, displaying, exhibiting, communicating to the public, streaming, transmitting, or otherwise exploiting or making any use of any copyrighted work owned or controlled by any of the Plaintiffs or the Class;

b.    Taking any action that directly or indirectly enables, facilitates, permits, assists, solicits, encourages or induces any use or other third party (i) to copy, host, index, reproduce, download, stream, exhibit, distribute, communicate to the public, upload, link to, transmit, display or otherwise use or exploit in any manner any copyrighted work owned or

controlled by any of the Plaintiffs or the Class, or any portion(s) thereof in any form; or (ii) to make available any copyrighted work owned or controlled by any of the Plaintiffs or the Class, or any portion(s) therefrom in any form, for copying, hosting, indexing, reproducing, downloading, streaming, exhibiting, distributing, communicating to the public, uploading, linking to, transmitting, or for any other use or means of exploitation, including via BitTorrent;

c.    Committing any acts intended to cause users to believe that the copies of any copyrighted work owned or controlled by any of the Plaintiffs or the Class available through Llama are authorized copies sponsored by, approved by, connected with, guaranteed by, or distributed under the control of the Plaintiffs or the Class;

d.    Otherwise infringing any copyrighted work owned or controlled by any of the Plaintiffs or the Class;

e.    Assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above subparagraphs (a) – (d); and,

f.    Moving, destroying, or otherwise disposing of any computer files, electronic files, business records, or documents related to Llama.

G.    Statutory damages and other damages pursuant to the Digital Millennium Copyright Act;

H.    Costs and attorney's fees pursuant to 17 U.S.C. § 1203(b) and 17 USC § 504;

I.    Pre-judgment and post-judgment interest; and,

J.    Such further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Hobbs and  Plaintiff Stone demand a trial by jury of all issues so triable.

DATED:    May 22, 2026                Respectfully submitted,

**STONE & MAGNANINI, LLP**

By:    */s/ David Stone*
       David S. Stone, Esq.
       400 Connell Drive, Suite 6200
       Berkeley Heights, New Jersey 07922
       Tel:    (973) 218-1111
       dstone@smcomplex.com
       *Attorneys for Plaintiffs Hobbs and Stone*